EUNICE CHAPMAN, Appellant, *v.* WILLIAM B. OGDEN, MAHLON D. OGDEN, and EDWIN H. SHELDON, Appellees.

APPEAL FROM SUPERIOR COURT OF CHICAGO.

The evidence in this case failed to sustain the allegations in the complainant's bill.

ON the 30th day of March, 1855, Eunice Chapman, the appellant, filed her bill of complaint in the Cook County Court of Common Pleas, against William B. Ogden, H. Hollis Hunnewell, and Ebenezer Thayer, setting forth, that on the 27th day of January, 1837, one Daniel A. Baldwin, and Abby Ann Baldwin, his wife, mortgaged to one Moses P. Hatch the following described lots, situated in the city of Chicago, to wit: lots numbered from one to twelve, inclusive, in block ninety-two of Parsons' subdivision of said block, in school section addition to said city, and lots five and six in block

number one hundred and forty-one, in the subdivision of Section 16, Town 39 North, of Range 14 east of the third principal meridian, then owned by said Daniel A. Baldwin, to secure the payment of twenty-two thousand five hundred dollars, with interest, according to the condition of a bond therein described; which mortgage was recorded in the recorder's office of Cook county, in book P of mortgages, page 33.

That some time in the year 1839, after the said bond and mortgage had fallen due, the said Baldwin, being unable to pay the same, applied to the firm of McNulty & Chapman, of the city of New York, consisting of Marvin McNulty and George M. Chapman, to purchase of said Moses P. Hatch the said bond and mortgage, and hold the same, and give him, Baldwin, a further day of payment.

That thereupon the firm of McNulty & Chapman consented to purchase said bond and mortgage, and employed Baldwin as their agent, to negotiate for them the purchase of the same. That thereupon Baldwin obtained from said Hatch an offer to accept lands in the State of Illinois, at certain rates per acre, in exchange for the bond and mortgage. That thereupon McNulty & Chapman furnished Baldwin with the requisite funds, and Baldwin, with the funds furnished, bought for them about 2,200 acres of land in the State of Illinois, the title to about 1,500 acres of which he took in the name of Albert McNulty, and the title to the balance he took in his own name. That thereupon Baldwin, acting as the agent of the firm of McNulty & Chapman, purchased for them the bond and mortgage of Hatch, and paid therefor by conveying to Hatch the portion of said lands which stood in Baldwin's own name, and by causing Albert McNulty to convey to Hatch the portion of said lands which stood in his name. That of the funds used in the purchase of said lands, the firm of McNulty & Chapman raised $1,521.75 upon a promissory note for that amount, made by Albert McNulty for their accommodation, payable to their order, by them indorsed, and also indorsed for their accommodation by the firm of Trask & Marvin, consisting of Alanson Trask and Azor S. Marvin.

That at the time of the purchase of said bond and mortgage, the firm of McNulty & Chapman directed Hatch to assign the same to Albert McNulty at his request, to be held by him in trust for them as security to himself and Trask & Marvin, against liability upon said promissory note, and to be assigned by him to the firm of McNulty & Chapman, upon payment of said note by them.   That accordingly, Hatch assigned the bond and mortgage to Albert McNulty, which assignment, though absolute on its face, was in fact taken upon the trusts and conditions above stated.   That said promissory note was not paid at maturity, and a suit was commenced by the holders thereof against all the parties thereto, and that afterwards, Albert McNulty, having become insolvent, by the consent of all parties in interest, assigned said bond and mortgage to Azor S. Marvin, to be held by him on the same trusts upon which the same were held by Albert McNulty.

That before said assignment to Albert McNulty, Marvin McNulty sold and conveyed to George M. Chapman all his interest in the firm of McNulty & Chapman, and in the assets thereof, including the interest of said firm in said bond and mortgage.

That some time thereafter, the suit on said note proceeded to judgment in the city of New York, against all of the parties to the note, and in order to relieve himself from the pressure of the judgment, George M. Chapman borrowed $1,600, of the firm of S. Welles & Co., consisting of Samuel Welles, of Paris, France, and H. Hollis Hunnewell, of Boston, Mass. That with said $1,600, and other moneys of his own, enough to make up $1,673.34, the amount of the judgment, George M. Chapman procured an assignment of the judgment from the plaintiff, the State Bank of Indiana, to H. Hollis Hunnewell, to be held by him for the firm of S. Welles & Co., and also certain other collaterals then placed in his hands by George M. Chapman, as security, until the $1,600, with interest, should be paid.

That at the time said judgment was assigned to Hunnewell, there was an execution issued thereon, in the hands of the sheriff of the city and county of New York, under which

execution the sheriff had levied upon certain goods of George M. Chapman, and which goods were afterwards sold by the sheriff under the same; from which he realized the sum of $640.42, beyond his fees and poundage, and which sum was paid by him to Hunnewell, April 15, 1840, in part satisfaction of the judgment.

That some time before the assignment of the bond and mortgage by Albert McNulty to Azor S. Marvin, and after Marvin McNulty had sold and conveyed to George M. Chapman his interest in the firm of McNulty & Chapman, and after the assignment of said judgment to H. Hollis Hunnewell to secure the loan of $1,600, George M. Chapman became embarrassed in his circumstances, and made a general assignment of all his property to one Daniel French, in trust for his creditors, including those of the late firm of McNulty & Chapman, whereby all of George M. Chapman's interest in said bond and mortgage became vested in Daniel French, subject to the trusts upon which the same were then held by Azor S. Marvin.

That some time after the loan of the $1,600, and after George M. Chapman's assignment to Daniel French, the firm of S. Welles & Co., without the knowledge or assent of French, induced Azor S. Marvin to assign said bond and mortgage to Ebenezer Thayer, the agent of S. Welles & Co., to be held by him as collateral security for the payment of said judgment, and thereupon the said Hunnewell released Azor S. Marvin, Alanson Trask and Albert McNulty, from all claim under the judgment.

That on the 18th day of August, 1840, Daniel French, in order to release said bond and mortgage, and other collaterals, from the lien of the loan for which the same were held, paid to Gracie & Sargent, the authorized agents of the firm of S. Welles & Co., $1,000, which covered the full amount of the balance due upon said loan, interest and expenses, after deducting the $640.42 received by Hunnewell upon the judgment assigned to him.

That said French thereupon requested a return of said collaterals from said S. Welles & Co., and an assignment of the

bond and mortgage to him, from the said Ebenezer Thayer, in whose name the same stood as aforesaid.

That said Gracie & Sargent thereupon returned to said French, the Kingsley bond and mortgage, part of said collaterals, and promised that as soon as Samuel Welles, of the firm of S. Welles & Co., should return from Paris, the balance of said collaterals should be returned, and the Hatch bond and mortgage should be assigned to said Daniel French.

That soon after, said Welles died in Paris, and that the said French had never been able to procure a return of the balance of said collaterals, or an assignment of said Hatch bond and mortgage, although he had repeatedly demanded the same of Hunnewell and Thayer.

That said French, never having been able to procure a formal assignment to himself of the Hatch bond and mortgage, in the month of October, 1846, exposed to auction upon due notice, such of the assets assigned to him by George M. Chapman as he had not been able to collect or turn into money, and among the rest, said Hatch bond and mortgage ; that the complainant was the highest bidder for the Hatch bond and mortgage, and that she then and there paid French the price bid for the same, and received an assignment thereof. That she had ever since remained the true and lawful owner of said bond and mortgage, and was entitled to a formal assignment of the same from Ebenezer Thayer. That she had frequently, since said bond and mortgage were assigned to her, applied, by her agent, to Hunnewell, for a formal assignment of the same from Thayer to her, and to Thayer to make such assignment, which they had always severally refused to do, or cause to be done.

That at the time the firm of McNulty & Chapman purchased said bond and mortgage of Hatch, and took the assignment thereof in the name of Albert McNulty, as aforesaid, said Hatch had already obtained judgment upon said bond in the city of New York, which fact, at the time of the assignment to Albert McNulty, and long subsequent thereto, was totally unknown to the firm of McNulty & Chapman, and to Albert McNulty, and their assignees.

That shortly after said assignment, the said Baldwin, believing that the security of the bond and mortgage could be in no respect impaired thereby, induced Hatch to execute a satisfaction of the judgment recovered by him, which he delivered to Baldwin, with the full understanding that the same was without consideration, and ·was in no respect to impair the lien of the mortgage upon the mortgaged premises, or the liability of Baldwin upon his bond. That some time after the assignment by Hatch of the bond and mortgage, Baldwin put the satisfaction piece on record, without the knowledge or consent of the firm of McNulty & Chapman, the owners of the bond and mortgage, and of every other person interested in the same; and the bill insists, that the security of the bond and mortgage was in no way impaired by said satisfaction piece, so far as the firm of McNulty & Chapman, and their assigns, are concerned.

That about the 5th day of March, 1842, Hunnewell and Thayer, without the knowledge or consent of French, fraudulently inveigled Baldwin into conveying to Thayer (Baldwin's wife joining therein,) the premises covered by the Hatch mortgage, which conveyance, though absolute, was to be in fact but a mortgage.

That Baldwin refused to make said conveyance to Thayer, until Hunnewell and Thayer agreed to consider the same as a mortgage to secure the payment of $1,150 only, which sum Hunnewell then claimed to be due him for cash advanced for taxes and other expenses connected with said mortgaged premises, less a small amount due upon the $1,600 loan, and that Baldwin should have an extension of eighteen months upon said sum of $1,150; and that upon payment of that sum, the conveyance should be void, and Thayer should satisfy the same by executing and delivering to Baldwin a quit-claim deed of the premises.

That Baldwin frequently within the eighteen months, and since, had offered to pay Thayer the sum of $1,150 and interest, and all other sums which he might be liable to pay under the $1,150 mortgage, and demanded that the same should be considered satisfied, and that a quit-claim deed should be

made to him of the premises therein described, which Thayer had always refused to do.

That at the time Hunnewell and Thayer inveigled Baldwin to make the $1,150 mortgage, they represented to him that they had ascertained the existence of the satisfaction piece of the judgment in favor of Hatch, and that the same, in their opinion, wholly destroyed the lien of the Hatch mortgage, and requested him to make them said $1,150 mortgage.

That they further represented to Baldwin that French was fully aware of the request they were making, and of the grounds thereof, and fully approved of the same, and that Baldwin, believing these statements, and relying upon the same, made the mortgage for $1,150, in the manner and upon the terms before stated.

That French never was aware of the request made by Hunnewell and Thayer of Baldwin to make said mortgage of $1,150; that he did not approve of the same, and that he never was aware of the mortgage for $1,150, nor of the manner in which Baldwin was induced to execute the same. That Thayer had since conveyed the premises to one Charlotte Smith, a sister or niece of the widow of Samuel Welles, without any consideration therefor, she having at the time full knowledge of the premises; and that Charlotte Smith, about the 9th day of April, 1850, conveyed the premises to William B. Ogden, without any consideration therefor. That William B. Ogden then occupied the premises as the agent of Hunnewell, and at the time the same were conveyed to Ogden he had a full knowledge of the premises, and was at that time, and for a long time had been employed by Hunnewell as his agent to look after said property.

That the complainant was never informed of said mortgage for $1,150 until the summer of 1853, and that upon being informed of the same, she immediately applied to Baldwin to protect and secure her against the consequences of the same.

That after considerable delay had occurred, on or about the 2nd day of January, 1855, Baldwin sold to the complainant, for a certain consideration then paid, the premises described in the Hatch mortgage; and in conjunction with Abby

34

Ann Baldwin, his wife, executed and delivered to the complainant a quit-claim deed of all his right, title and interest in said premises.

That some time after Hunnewell and Thayer obtained from Baldwin the mortgage for $1,150, William B. Ogden took possession of the premises as the agent of Hunnewell, and has since taken charge of the same; that he had since, from time to time, let parts of the premises to various persons, from whom he had received a large amount of money by way of rent for the property; and that he had received a large portion of the money subsequent to the date of Baldwin's deed to the complainant. That the complainant had applied to William B. Ogden to account for the rents he had received, and pay to the complainant what he had received beyond $1,150, and interest thereon; to deliver up to her, possession of the premises, and execute and deliver to her a quit-claim deed of the same; and that William B. Ogden refused to comply with such requests.

The bill waived an answer under oath, and prayed that an account might be taken of the rents and profits of the premises received by the defendants, or either of them; and an account of all moneys received by Thayer, or by Hunnewell, upon the other collaterals originally assigned to Thayer for the benefit of S. Welles & Co., beside the Hatch mortgage; and that if it should appear that the rents and profits and the proceeds of the other collaterals were more than sufficient to satisfy all liens upon the premises, which should be paid to the defendants, or either of them, that the residue might be paid over to the complainant, and that the complainant might be permitted to redeem the premises, if the mortgage for $1,150 should be adjudged to be valid as against her, she being ready and willing, and thereby offering to pay what, if anything, might be due thereon; and that in any event, the defendants might be decreed to deliver up the possession of the premises to the complainant, or to such person as she should direct, free from all incumbrances made by them, and might deliver to the complainant all deeds and writings in their custody or power relating to the premises; and that William B. Ogden

might execute a quit-claim deed to her of the premises, and for other and further relief.

On the 1st day of December, 1855, the several answer of William B. Ogden was filed, setting forth, that on the 23rd day of February, 1842, Daniel A. Baldwin, by his absolute deed of that date, conveyed the premises to Ebenezer Thayer; which was recorded in the recorder's office of Cook county, September 14, 1843, and that Azor S. Marvin, on the 23rd day of February, 1842, assigned and transferred Baldwin's bond and mortgage to Hatch to said Thayer, thereby vesting in him an absolute title to the premises. That on the 26th day of December, 1844, Ebenezer Thayer conveyed the premises to Charlotte Smith, who was a *bona fide* purchaser, for a valuable consideration, without notice of any of the alleged equities of the complainant; and that on the 9th of April, 1850, Charlotte Smith, who is a niece of the widow of Samuel Welles, conveyed the premises to the defendant, William B. Ogden, who was a *bona fide* purchaser for the sum of $6,000 cash paid therefor, without notice of any of the alleged equities of the complainant; which deed was recorded in the recorder's office of Cook county; April 23, 1850. The answer further states, that in the winter and spring of 1850, the defendant, William B. Ogden, became desirous of purchasing the premises as an investment. That upon inquiry and examination of the record, he found the title to be vested in Charlotte Smith, and that her title was derived from said conveyance of Ebenezer Thayer to her. That the title of Ebenezer Thayer appeared to be perfect of record by said deed of Daniel A. Baldwin to him, recorded as before stated, and various other conveyances showing an absolute title in him as early as February, 1842, and that said Ogden learned that Ebenezer Thayer had, at that time, obtained an outstanding tax title derived through Hugh T. Dickey to John P. Marvin, and by him transferred to Thayer, as early as February, 1842.

That said Ogden, finding the title absolute in Thayer, and that he had been in the quiet and peaceable possession of the premises from 1842 to 1844, when he conveyed to Charlotte

Smith, and that she had been in like possession from that time to April, 1850, purchased and paid for the premises in good faith, and without notice, as before stated, and thereupon entered into actual possession thereof, and occupied the same quietly and peaceably until he sold and conveyed the same as hereafter stated. The answer admits, that in December, 1842, the firm of Ogden & Jones, of which William B. Ogden was a member, took possession of the premises as the agents of Thayer, and that until the sale of the same by William B. Ogden, he and the firms of Ogden & Jones and Ogden, Jones & Co., did let parts of the premises to various persons, but denies that he or they received a large amount of money therefor, and states that he received nothing whatever, and that said firms received nothing over and above the amount necessary to pay the taxes thereon, and other incidental expenses. The answer further avers, that the complainant, Daniel A. Baldwin and George M. Chapman, had knowledge of the conveyances from Ebenezer Thayer and Charlotte Smith. The answer also avers, that Baldwin's bond to Hatch and the judgment thereon, were discharged of record July 26, 1841, and that the mortgage executed to secure the bond was thereby discharged. It also avers, that if there was a conveyance from Baldwin to the complainant, it was made by Baldwin to enable him to be a witness in the case, and that Baldwin and George M. Chapman were the real parties in interest in the suit, who were using the name of the complainant for their benefit, and insists that they were necessary parties to the complainant's bill.

The answer also sets forth, that on the 1st day of March, 1855, and before the filing of the complainant's bill, William B. Ogden transferred and conveyed the premises to Mahlon D. Ogden and Edwin H. Sheldon, in their own right and as executors of William E. Jones, deceased, by deeds of conveyance of that date; that such conveyance was absolute, and that he had received the full value of the property; and that said William B. Ogden had not, and did not claim or pretend to have, any right, title, claim or interest, direct or indirect, in or to the premises, and makes an express disclaimer of the same.

The answer sets up the statute of frauds, and specifically denies all the other allegations of the bill.

A replication to this answer was filed December 27, 1855.

On the 10th day of April, 1856, the bill was taken as confessed as against Hunnewell and Thayer, for want of an appearance, and leave was given to amend the bill by making Mahlon D. Ogden and Edwin H. Sheldon, parties thereto.

On the 25th day of July, 1856, the complainant amended her bill, by alleging, that on or about the 1st day of March, 1855, by deeds purporting to be dated on that day, William B. Ogden pretended to convey to Edwin H. Sheldon and Mahlon D. Ogden, in their own right and as the executors of William E. Jones, deceased, some interest in a part or the whole of the premises, and that the said Edwin H. Sheldon and Mahlon D. Ogden claimed to have an interest in the premises by virtue of said deeds, but the complainant charged that said deeds were either made in the anticipation and belief that the complainant's bill was about to be filed, or with the knowledge that the same had been filed, and with the intention of harassing and defrauding the complainant, and for no other purpose, and that said deeds were, in pursuance of such intention, ante-dated, and were not in fact executed and delivered until long after they bear date, and subsequent to the filing of the complainant's bill. That Mahlon D. Ogden was the brother, and Edwin H. Sheldon and William E. Jones were the brothers-in-law, of William B. Ogden, and that neither of them paid to William B. Ogden any valuable consideration for the property, and that Mahlon D. Ogden and Edwin H. Sheldon took the property with a full knowledge of all the facts stated in the bill in relation to the right and claim of the complainant. That Mahlon D. Ogden and Edwin H. Sheldon had been and were partners in business with William B. Ogden, and had theretofore been employed by Hunnewell as his agents, in connection with William B. Ogden, to look after and protect the property.

An answer under oath was waived as to Mahlon D. Ogden and Edwin H. Sheldon, and the amended bill prayed for the same relief as to them as prayed for by the original bill, and

further prayed, in case William B. Ogden should have conveyed the property, or any part thereof, or interest therein, to Mahlon D. Ogden and Edwin H. Sheldon, or to any other person or persons who were or might be innocent purchasers thereof, in order to place the same beyond the reach of the complainant, that William B. Ogden might be compelled, by decree of the court, to pay to the complainant the value of the property conveyed by him.

On the 17th day of December, 1856, William B. Ogden filed his answer to the complainant's amended bill, which sets forth, that on the 13th day of May, 1837, Moses P. Hatch, by his deed of assignment of that date, assigned and transferred the bond and mortgage of Daniel A. Baldwin to one Charles S. Phelps; which deed of assignment was recorded in the recorder's office of Cook county, June 24, 1837. That after William B. Ogden had acquired the title to the premises as stated in his original answer, and after he had entered into possession of the premises under such purchase, and while he so remained in possession, for the purpose of protecting his title, he purchased of Charles S. Phelps all his right, title and interest in and to said bond and mortgage ; and that thereupon said Charles S. Phelps, by his deed dated October 23, 1852, assigned and transferred the same to him, which deed was duly recorded May 10, 1855, and he claimed to be substituted to all of the rights of said Phelps to said bond and mortgage.

The answer admits that Moses P. Hatch, by his attorney, Theophilus S. Morgan, on the 20th day of December, 1839, executed a deed of assignment of that date, to Albert McNulty, of Baldwin's bond and mortgage to Hatch; which was duly recorded, May 11, 1840, but denies any knowledge of the purposes for which it was made, further than the same appears upon its face; and particularly denies that it was made or received for any of the purposes or upon any of the trusts alleged in the bill.

The answer sets up the statute of frauds in relation to the trust alleged in the bill, under which Albert McNulty held the assignment of Baldwin's bond and mortgage to Hatch, and

denies that the alleged trust was manifested or proved by any writing whatever, and claims the benefit of the statute in that respect.

It avers that neither Ebenezer Thayer, nor Charlotte Smith, nor William B. Ogden, ever had any notice, actual or constructive, before or at the times they severally acquired their titles to the premises, and the bond and mortgage, and insists that if any secret trust existed, he could in no way be affected or charged by reason thereof.

The answer admits that Albert McNulty, on the 27th day of March, 1840, by his deed of assignment of that date, assigned and transferred to Azor S. Marvin, the bond and mortgage of Baldwin to Hatch, upon certain trusts, setting them forth, and referring to the original assignment for further particulars, which was recorded May 11, 1840, but denies that the assignment was made upon the trusts and conditions alleged in the bill.

The answer admits that Albert McNulty became insolvent, and states that he was decreed a bankrupt by the District Court of the United States for the Southern District of New York, and that William C. H. Waddell was by that court appointed the general assignee in bankruptcy for such district, who thereby became vested with any interest which Albert McNulty might have had in the bond and mortgage of Baldwin to Hatch.

That said Waddell, as such assignee in bankruptcy, had by deed assigned and transferred unto Mahlon D. Ogden and Edwin H. Sheldon, all of the right, title and interest of Albert McNulty in and to the bond and mortgage of Baldwin to Hatch, and the answer insists, if said bond and mortgage are not paid and satisfied, that Ogden is entitled to be protected to the full amount due thereon.

The answer further sets forth the sale of the premises in 1838, for non-payment of taxes, the conveyance thereof, in pursuance of such sale, by three several deeds to Hugh T. Dickey, on the 10th day of December, 1840, and insists that by such proceedings a valid title to the premises became vested in said Dickey, and states that said Dickey, on the

11th day of December, 1840, conveyed the premises to John P. Marvin.

The answer further sets forth, that on the 23rd day of February, 1842, George M. Chapman, Daniel A. Baldwin, Albert McNulty, Azor S. Marvin, Alanson Trask, Marvin McNulty, and John P. Marvin, proposed to Ebenezer Thayer, as the agent of Hunnewell, that he should buy the premises and pay for the same by discharging the judgment in favor of the State Bank of Indiana, upon which the sum of $1,019.92 and interest, was then due, pay John P. Marvin $216 for the tax title acquired as before stated, the sum of $200 in liquidation and discharge of a judgment before that time recovered upon a note drawn by McNulty & Chapman and indorsed by Trask & Marvin, dated September 7, 1839, for $775, or thereabouts, payable sixty days after date, mentioned in the assignment from Albert McNulty to Azor S. Marvin, and pay the costs of a suit in chancery in favor of said Hunnewell, against George M. Chapman, Marvin McNulty, Azor S. Marvin and Alanson Trask, then pending, and dismiss said suit; which proposition was accepted by Thayer, as the agent of S. Welles & Co., and thereupon Baldwin, by his deed dated February 23, 1842, conveyed the premises to Thayer; and Azor S. Marvin, by his deed dated the same day, assigned and transferred to Thayer the bond and mortgage of Baldwin to Hatch, and John P. Marvin, by his deed dated the same day, conveyed the premises to Thayer; thereby vesting in him an absolute and complete title to the premises; and thereupon, Hunnewell dismissed the suit in chancery, discharged the judgment therein described, and paid the several sums before stated, which judgment and said sums of money far exceeded the value of the premises at that time. The answer further sets forth, that Charlotte Smith was a *bona fide* purchaser for a valuable consideration, without notice of the alleged equities of the complainant. That Hunnewell entered into possession of the premises in 1842, and remained in possession until 1844; that Charlotte Smith and William B. Ogden severally entered into possession at the times when they respectively purchased the premises, and remained in possession during the

times they respectively held the title thereto; and Mahlon D. Ogden and Edwin H. Sheldon entered into possession when they purchased, and ever since had remained and still remained in possession of the same.

That Hunnewell, Charlotte Smith, William B. Ogden, and Mahlon D. Ogden and Edwin H. Sheldon, had severally been in possession of the premises under the title perfected in Thayer as before stated, *bona fide*, and adverse to all persons whatever, and had each severally, while so in possession, since the year 1842, paid all taxes assessed upon the premises and every part thereof; and insists that Mahlon D. Ogden and Edwin H. Sheldon ought to be adjudged and held the legal owners of the premises in fee simple, according to the extent and purport of their paper title.

The answer further states, that on the first day of March, 1855, William B. Ogden conveyed the premises to Mahlon D. Ogden and Edwin H. Sheldon, in their own right, and as executors of William E. Jones, deceased, and avers the deeds of the same were made, executed and delivered on the day of their date, and were not ante-dated, and were not made in anticipation or with the belief that the complainant's bill was, or was about to be, filed. The answer denies that the conveyances from William B. Ogden to Mahlon D. Ogden and Edwin H. Sheldon were without consideration, and avers that Mahlon D. Ogden and Edwin H. Sheldon paid to William B. Ogden, as the consideration for the conveyances, the full value of the premises, and that Mahlon D. Ogden and Edwin H. Sheldon, neither at that time, nor before, had any notice of the alleged equities of the complainant. The answer insists, that the complainant is not entitled to maintain her bill against William B. Ogden, for damages.

To the further answer of William B. Ogden a replication was filed November 23, 1857.

On the 4th day of December, 1856, Mahlon D. Ogden and Edwin H. Sheldon filed their joint and several answer. It admits that Daniel A. Baldwin, and Abby Ann Baldwin, his wife, on the 27th day of January, 1837, executed a mortgage of that date to Moses P. Hatch, of the premises mentioned

in the bill, then owned by Baldwin, to secure the payment of $22,500, payable in four annual installments, with annual interest at seven per cent., specified in the condition of a bond of that date, in the penal sum of forty-five thousand dollars, executed by Baldwin to Hatch; and that said mortgage was recorded in the recorder's office of Cook county, June 24, 1837, in book P of mortgages, page 33.

It states that on the 13th day of May, 1837, Moses P. Hatch, by his deed of assignment of that date, assigned and transferred said bond and mortgage to Charles S. Phelps; which deed of assignment was recorded June 24, 1837.

That Charles S. Phelps, on the 23rd day of October, 1852, by his deed of assignment of that date, assigned and transferred the bond and mortgage to William B. Ogden; which deed of assignment was recorded May 10, 1855.

The answer admits that a note for about the sum of $1,521.75 was drawn by Albert McNulty, payable to the order of McNulty & Chapman, indorsed by that firm, and also indorsed by the firm of Trask & Marvin—consisting of Alanson Trask and Azor S. Marvin—and said note, so made and indorsed, was discounted by the State Bank of Indiana, but for whose benefit or accommodation the note was made, indorsed, or discounted, or for what purpose the funds derived from the discount of the note were used, the defendants had no knowledge, information or belief.

The answer admits that Moses P. Hatch, on the 9th day of December, 1839, by his letter of attorney of that date, authorized and empowered one Theophilus S. Morgan to assign and transfer said bond and mortgage; which letter of attorney was recorded May 11, 1840; and that Moses P. Hatch, by his attorney, Theophilus S. Morgan, on the 20th day of December, 1839, by his deed of assignment of that date, assigned and transferred the bond and mortgage to Albert McNulty; which deed of assignment was recorded May 11, 1840; but the answer denies all knowledge, information or belief relative to the purposes for which the assignment was made, further than the same appears on the face thereof, and specially denies that the assignment was made or received

for any of the purposes or upon any of the trusts or conditions alleged in the bill.

The answer sets forth the statute of frauds, and denies that the trust alleged in the bill is manifested or proved, or susceptible of being proved by any writing signed by Albert McNulty, and insists upon the statute.

The answer admits that on the 29th day of January, 1840, the State Bank of Indiana, by the consideration of the Court of Common Pleas of the city of New York, recovered a judgment against Albert McNulty, Marvin McNulty, George M. Chapman, Alanson Trask, and Azor S. Marvin, upon the note drawn by Albert McNulty and indorsed by the firm of McNulty & Chapman, and Trask & Marvin, for the sum of $1,660.30, damages and costs.

That a *fieri facias* issued on said judgment, January 29, 1840, which was returned *nulla bona*, February 10, 1840; that an *alias* writ of *fieri facias* issued February 10, 1840; and that on the 8th day of March, 1840, the State Bank of Indiana, by their deed of assignment of that date, assigned and transferred the judgment to H. Hollis Hunnewell, for the benefit of the firm of S. Welles & Co., and that when the judgment was so assigned, the *alias* writ of *fieri facias* thereon was in the hands of the sheriff, who had levied upon certain goods and chattels as the property of George M. Chapman; which were afterwards sold by the sheriff, from which he realized the sum of $640.42, beyond his own fees, and which sum was paid by him to Hunnewell, September 21, 1840, when he returned the *alias* writ of *fieri facias nulla bona* as to the residue. That on the 26th day of December, 1840, a *pluries* writ of *fieri facias* was issued, which was returned *nulla bona*, December 28, 1840. That on the 30th day of December, 1840, Hunnewell filed his bill in chancery, before the vice chancellor of the city of New York, setting forth the recovery of said judgment, the issuing of said writs of *fieri facias* and the several returns thereto; and that there was justly due upon the judgment, the sum of $1,019.92, with interest, over and above all claims of the defendants, or either of them, by way of offset or otherwise; which suit was pend-

ing in said court at and until the time of the settlement of the same as hereinafter stated. The answer avers, that at the time of the commencement of said suit, and ever after until the settlement of the same, George M. Chapman admitted the sum of $1,019.92, with interest, was due upon said judgment, and wholly unpaid; and that he, George M. Chapman, had no right, title or interest in said bond and mortgage; and avers that Hunnewell, as the friend of Chapman, was endeavoring to subject the same to the payment of the judgment, to save Chapman from paying the same himself.

The answer denies, that the assignment of said judgment was procured by George M. Chapman with his own moneys, in whole or in part, or with moneys borrowed by him of the firm of S. Welles & Co., either in whole or in part; and also denies that the judgment was transferred to Hunnewell, to be held by him as collateral security for any sum of money whatever, and that any collaterals were placed in Hunnewell's hands for or on account of the judgment, or as security for its ultimate payment.

The answer denies that George M. Chapman borrowed any money of the firm of S. Welles & Co., as alleged in the bill.

The answer admits that Albert McNulty, on the 27th day of March, 1840, executed a deed of assignment, of that date, whereby he assigned and transferred to Azor S. Marvin the bond and mortgage executed by Baldwin to Hatch in trust, setting forth the trusts, and referring to the assignment for particulars; which deed of assignment was recorded May 11, 1840.

The answer denies that said deed of assignment to Azor S. Marvin was made upon the trusts and conditions alleged in the bill.

The answer admits that Albert McNulty became insolvent, and states that he was declared a bankrupt by the District Court of the United States for the Southern District of New York, and that W. C. H. Waddell was by that court appointed the general assignee in bankruptcy for such district, who thereby became vested with any interest which Albert McNulty might have had in the bond and mortgage of Baldwin to Hatch.

The answer denies the assignment from Marvin McNulty to George M. Chapman, of Baldwin's bond and mortgage to Hatch, and the assignment of the same by George M. Chapman to Daniel French, and insists that neither of them ever had any interest in the bond and mortgage to assign. The answer denies that Daniel French or George M. Chapman ever paid Gracie & Sargent any sum of money to release said bond and mortgage, as alleged in the bill, and that French ever requested Gracie & Sargent to procure an assignment of the bond and mortgage from Ebenezer Thayer; and especially does it deny that such request was made as alleged in the bill, for the reason that at the time such request is pretended to have been made, the bond and mortgage had not been assigned to Thayer, and was not assigned to him until eighteen months thereafter, during which time Chapman and Hunnewell were using every effort in their power to subject the bond and mortgage to the payment of the balance due upon the Indiana Bank judgment.

The answer admits that the firm of Welles & Co. did, at various times prior to the year 1842, make advances to George M. Chapman, through the firm of Gracie & Sargent, and otherwise, and upon receiving divers collaterals and securities, for the repayment of said advances; that Chapman, when some of the advances were made, gave to Gracie & Sargent his receipts for the same; but the answer denies that such advances had any connection with the amount due upon said judgment, or with said bond and mortgage, and avers that if any moneys were paid to Gracie & Sargent, by French or Chapman, for the firm of Welles & Co., that such moneys were paid in liquidation of such advances, and not on account of the amount due upon said judgment.

The answer denies that the Kingsley mortgage mentioned in the bill, was ever taken or held as collateral to the amount due upon said judgment, and avers that the Kingsley bond and mortgage, and a deed of certain lots in Lowell, were expressly pledged and assigned to Gracie & Sargent for another advance by them which Chapman had agreed to pay within one fortnight from the time such advance was made.

The answer alleges that the defendants have no knowledge, information or belief whether Gracie & Sargent ever returned to French the Kingsley bond and mortgage, or whether Gracie & Sargent ever promised French that any other collaterals should be returned to him at any time whatever, and denies that Gracie & Sargent ever promised that Baldwin's bond and mortgage should be assigned to French. The answer admits that Samuel Welles died in Paris, and that French was never able to procure an assignment of Baldwin's bond and mortgage; but it denies that French ever demanded such an assignment from Thayer or Hunnewell, and avers that the defendants have no knowledge, information or belief respecting a return of the other collaterals mentioned in the bill, or respecting a demand for the same.

The answer admits that Moses P. Hatch, on the 2nd day of July, 1838, by the consideration of the Supreme Court of the State of New York, recovered a judgment against Daniel A. Baldwin, upon his bond, for the sum of $45,026.91, debt or damages and costs, and that the docket of said judgment was canceled upon the filing of a certificate of satisfaction, signed by Hatch; but upon what consideration, at whose instance, or at what time, the certificate of satisfaction was executed or filed, or whether McNulty & Chapman, or Albert McNulty, or any other person, was cognizant of the recovery of said judgment, or of the discharge thereof, the answer avers that the defendants have no knowledge, information or belief.

The answer sets forth the sale of the premises in 1838, for non-payment of taxes; the conveyance of the same, in pursuance of such sale, by three several deeds to Hugh T. Dickey, on the 10th day of December, 1840, and insists that by such proceedings a valid title to the premises became vested in said Dickey; and states that Dickey, on the 11th day of December, 1840, conveyed the premises to John P. Marvin.

The answer further sets forth that on the 23rd day of February, 1842, George M. Chapman, Marvin McNulty, Daniel A. Baldwin, Albert McNulty, Azor S. Marvin, Alanson Trask, and John P. Marvin, proposed to Ebenezer Thayer, as the agent of Hunnewell, that he should buy the premises, and

pay for the same by discharging the judgment in favor of the State Bank of Indiana, upon which the sum of $1,019.92, with interest, was due, by paying John P. Marvin $216, for the tax title he had acquired, paying $200 in liquidation and discharge of a judgment which had been before that time recovered upon the note of $775, or thereabouts, mentioned in the assignment of Albert McNulty to Azor S. Marvin, and by paying the costs of the suit in chancery in favor of Hunnewell, against George M. Chapman, Marvin McNulty, Albert McNulty, Azor S. Marvin and Alanson Trask, then pending, which suit was to be dismissed.    That Thayer, as the agent of Welles & Co., accepted the proposition, and thereupon Baldwin and wife, by their deed bearing date the 23rd day of February, 1842, conveyed the premises to Thayer; that Azor S. Marvin, by his deed of the same date, assigned and transferred the bond and mortgage executed by Baldwin to said Thayer, and that John P. Marvin, by his deed of the same date, conveyed the premises to said Thayer, thereby vesting in him a complete and perfect title to the premises; and that thereupon Hunnewell dismissed the chancery suit, discharged the judgment therein described, and paid the several sums above stated; which judgment, and the said several sums of money, far exceeded the value of the premises at that time.

The answer admits that the title to the premises was perfected in Thayer, for the benefit of Welles & Co., but denies that either of the conveyances or transfers to him were made, received or held as collateral security for any sum of money whatever.    The answer also denies that the deed from Baldwin to Thayer was made or received as a mortgage to secure the payment of any sum of money whatever, or that either of the parties intended or understood it to be a mortgage; and avers that both parties understood and intended the deed to be an absolute sale and conveyance.

The answer sets forth the act of the legislature, approved January 31, 1827, requiring all defeasances or writings intended to operate as such, to be recorded within thirty days after the absolute deed which it is intended to affect, is

recorded; and after denying the existence of any such defeasance, or writing intended to operate as such, avers that no such writing was ever recorded, and claims the benefit of the statute. The answer also sets forth, that Ebenezer Thayer, on the 16th day of December, 1844, conveyed the premises to Charlotte Smith, who, the defendants aver, was a *bona fide* purchaser, for a valuable consideration, without notice of any of the alleged equities of the complainant.

The answer also sets forth that Charlotte Smith, on the 9th day of April, 1850, by her deed of that date, sold and conveyed the premises to William B. Ogden, who, the defendants aver, was a *bona fide* purchaser, for a valuable consideration, without notice of any of the alleged equities of complainant. The answer also sets forth that in 1843, Hunnewell, as the representative of the firm of Welles & Co., entered into actual possession of the premises, and continued in such possession until the sale to Charlotte Smith, when she entered into possession of the same, which remained until she sold the premises to William B. Ogden; at which time he took possession and continued the same until the sale to the defendants, who then entered into possession and had so remained ever since. The answer avers that Hunnewell, Charlotte Smith, William B. Ogden, and the defendants, had severally, while in possession since 1842, paid all taxes legally assessed upon the premises, and claimed title to the same under the title perfected in Thayer, as above stated, *bona fide*, and adverse to all persons whatever; and insists upon the protection of the statute of limitations.

The answer admits that William B. Ogden was the agent of Hunnewell, and of Charlotte Smith, for the purpose of taking charge of the premises and paying taxes thereon, from the time Hunnewell took possession of the same until the same were purchased by said Ogden.

The answer admits that William B. Ogden rented parts and portions of the premises, and received rents therefor, but the defendants have no knowledge of the amount thus received.

The answer also sets forth that William B. Ogden, on the 1st day of March, 1855, conveyed the premises to the defend-

ants in their own right and as executors of William Jones, deceased, and avers that they were *bona fide* purchasers, for a valuable consideration, without notice of any of the alleged equities of the complainant. The answer admits, that the defendants had been and were partners of William B. Ogden, and that they jointly with him had been the agents of Hunnewell, to look after the property and pay taxes thereon. The answer insists that Baldwin ought to have been made a party to the suit, and especially denies all the other allegations of the bill.

A replication was filed to this answer on the 12th day of December, 1856.

The leading facts of this case are :

That on the 27th day of January, 1837, Daniel A. Baldwin and wife executed a mortgage to Moses P. Hatch, of lots 1 to 12 inclusive in Block 82, and of lots 5 and 6 in Block 141, School Section Addition to Chicago, then owned by Baldwin, to secure the payment of $22,500, payable in four annual installments, with interest at seven per cent. per annum ; this mortgage was duly recorded. Baldwin also executed another mortgage of the same date, upon certain lands in the county of Oswego, New York, known as the Parsons farm, to secure the payment of a bond for $11,500.

Both mortgages, although professing to be made to secure certain sums of money due from Baldwin to Hatch, were in fact given as security that Baldwin would faithfully carry out a certain land contract entered into by him with Hatch—to convey to Hatch certain lands in Will county, Illinois.

At the time these mortgages were given, Hatch was the owner of the Oswego Hotel property (so-called) in Oswego, New York, and he then agreed with Baldwin to sell this property to him. Baldwin paid part down ; and was to pay the residue in Illinois lands in Will county, as soon as he could procure the title to them.

At this time Baldwin was the owner of divers parcels of land and lots at Oswego ; and in the summer of that year he made proposals in writing to the firm of McNulty & Chapman, to sell them these Oswego lands and lots, and take goods

35

in payment therefor. These proposals were accepted by McNulty & Chapman, who at that time were furnishing mortgage securities as collateral to their numerous creditors; and who could make these Oswego lands directly available, as the basis of large mortgages, for that purpose, through the device of a sale, and mortgage back, for the purchase-money; as in case of one-third of the Parsons farm, to be taken of Baldwin for $4,000; and which was almost immediately disposed of to one Charles Webb, who gave back a mortgage on the one-third for $12,000, which was then turned out by McNulty & Chapman as collateral security.

After making the foregoing arrangement, Baldwin conveyed to McNulty & Chapman the one-third of the Parsons farm, and other property at Oswego; and agreed to convey to them his interest in the Hotel property; and had received from McNulty & Chapman from time to time, a considerable amount of goods prior to the 6th of October, 1838, under his contracts of sale of the above lands. In the fall of 1838, in furtherance of the arrangement between Baldwin and McNulty & Chapman, the latter sent one Hopkins to Chicago with a quantity of goods for account of Baldwin; who instructed McNulty & Chapman, in what manner he wished the proceeds of these goods applied; particularly directing that part of the proceeds should be invested in Will county lands, and stating what lands Hatch had selected, and was willing to take in satisfaction of the agreement on account of which the mortgages made by Baldwin were executed.

The contracts made between McNulty & Chapman, and Baldwin, have not been produced, but enough appears from the correspondence between them to show that in the fall of 1838, Baldwin was deriving means from his sales to McNulty & Chapman, with which to purchase in his own name and immediately take title to, a large quantity of land in Will county; part of which was to go to Hatch.

It further appeared, that on the 6th of May, 1839, Baldwin had failed to procure lands of the quality and description which he had agreed to furnish to Hatch, or which Hatch was willing to receive in satisfaction of his land contract;

and accordingly it became necessary for Baldwin to procure additional lands for Hatch. At this time a note of $1,521.75 made by Albert McNulty to the order of McNulty & Chapman, and indorsed by them, by Trask and Marvin, and by H. T. Dickey, was made, sent to the State Bank of Indiana, and there discounted, and the proceeds put into lands; about 1,200 acres of these lands, together with about 1,000 acres directly from Baldwin, were conveyed for the benefit of Hatch, in satisfaction of his land agreement with Baldwin. Baldwin, on the same day of the date of the note above mentioned, entered into a land contract with McNulty & Chapman, but this contract was not produced in evidence, nor its terms proved in the case. When the purpose for which the two mortgages were given had been thus answered, instead of releasing them, Hatch, who had already obtained judgment on the bond accompanying the larger mortgage, and a decree of foreclosure of the other, by his attorney in fact assigned the mortgages to Albert McNulty, and afterwards entered the judgment on the $22,500 bond secured by the mortgage (the one here in question) satisfied of record, at the instance of Baldwin. Afterwards, by an assignment, dated the 27th March, 1840, Albert McNulty, who was the maker of the note of the 6th May, 1839, assigned this mortgage to Azor S. Marvin, one of the indorsers thereof, in trust amongst other things to protect Trask and Marvin, as indorsers on said note. Prior to this assignment, to wit, on the 29th January, 1840, the State Bank of Indiana had recovered a judgment on the note held by it, against Albert McNulty, McNulty & Chapman, and Trask & Marvin— and two executions had been issued on this judgment, and one returned *nulla bona* against McNulty & Chapman. At this juncture, H. Hollis Hunnewell, acting on behalf of the firm of S. Welles & Co., of which he was a member, bought this judgment, and the execution then in the hands of the sheriff was levied on certain goods, etc., of McNulty & Chapman, and the sum of $640.42 made thereon; and the same was returned unsatisfied for the residue of upwards of $1,000. Afterwards, and on the 30th December, 1840, having

failed to make anything more out of the defendants in the judgment, all of whom were apparently insolvent, he filed a creditor's bill against all of them, viz., George M. Chapman, Marvin McNulty, Albert McNulty, Alanson Trask, and Azor S. Marvin, and amongst other things seeking to enforce the trusts set forth in the assignment of the $22,500 mortgage from Albert McNulty to Azor S. Marvin, to wit, to apply the proceeds to the payment of the balance due on the Bank of Indiana judgment. The complainant, on her part, in this cause, admits that the bill—the Hunnewell bill—was filed for this purpose at the instance of George M. Chapman. All the parties having any supposed interest in this large mortgage were thus before the court except D. A. Baldwin; Albert McNulty, and Trask & Marvin filed answers under oath to the bill. The trusts in favor of Hunnewell charged in his bill, and upon which he claimed to have the mortgage appropriated, were admitted by the answers filed; and although G. M. Chapman did not answer the bill, yet the matters which he was striving to force Trask & Marvin to disclose, so that Hunnewell might thereby realize the balance of the judgment, were fully admitted.

The Hunnewell suit was in the beginning conducted by George White, Esq., but in 1842 the suit was passed over to Mr. C. C. King, of New York, the solicitor of S. Welles & Co., and in January, 1842, no hearing having been had, he commenced negotiations with a view to a settlement of the whole matter.

Afterwards, and on the 5th day of March, 1842, King effected a final settlement and arrangement of the Hunnewell suit, apparently with the assent of all parties interested in it. From Azor S. Marvin an assignment of the mortgage in question was made to Ebenezer Thayer, trustee of S. Welles & Co., by an instrument delivered the 5th March, 1842.

From John P. Marvin, the son of A. S. Marvin, who had obtained certain tax deeds of the property, a conveyance was made on said 5th day of March, 1842, to Ebenezer Thayer.

From Daniel A. Baldwin, who held the equity of redemption, undisputed, a conveyance by deed of warranty was at

the same time made to Thayer, thus vesting in him a perfect title to the lands now in controversy.

As a part of this settlement, King at the same time agreed in behalf of the defendants in the Indiana bank judgment, and in the creditor's bill filed thereon, to satisfy the balance due on the judgment, and to dismiss the creditor's bill, all of which was afterwards substantially done. And in behalf of Baldwin who had conveyed the fee of the land, King agreed to procure an agreement from Thayer to sell to Baldwin the Chicago property in question for $1,150, and interest and taxes, etc., from said 5th day of March, 1842, provided Baldwin would pay the purchase money as above within eighteen months from that date, and close the purchase.

Prior to this time, and on the 16th January, 1840, the firm of McNulty & Chapman was dissolved, and Marvin McNulty assigned all his interest in the assets to George M. Chapman, in trust, with a view to closing up the affairs of the firm ; and on the 24th March, 1840, Chapman made a general assignment for the benefit of creditors, of all the effects of the firm, to Daniel French. In this assignment, the schedule of assets appears to be made out with great particularity, and it professes to enumerate all the debts, dues, claims and property of the late firm of McNulty & Chapman, so far as the same could be made out from the books of said firm, on the 25th of March, 1840, except such as they held as collateral security for debts due the concern ; the schedules also profess to give an account of all bonds and mortgages, etc., passed away as collateral security for the debts of McNulty & Chapman before that time ; but the Baldwin bond and mortgage are nowhere mentioned or referred to in these schedules.

On the 24th of March, 1842, in the District Court of the United States for the Southern District of New York, Chapman filed his petition for discharge under the bankrupt law of 1841 ; to this petition voluminous schedules were attached, setting forth his assets. These schedules were filed but a few days after King had made the settlement of the Indiana bank judgment, but there is no allusion therein to the Baldwin bond

and mortgage. An order was soon after made by the court in bankruptcy, granting a discharge to Chapman; but a motion was subsequently made to set aside the order, on the ground of fraud in concealing assets; and the whole matter was referred to Commissioner Cambrelling to take the proofs therein; Chapman, French, Marvin McNulty and Albert McNulty, Eunice Chapman and others, were severally examined on oath in relation to the assets of McNulty & Chapman, and all failed to make any mention of the Baldwin mortgage, or to assert any interest in it. Afterwards, on the 25th of November, 1844, George Wildes et al. filed a creditor's bill to enforce claims against the firm of McNulty & Chapman, against George M. Chapman, Marvin McNulty, Daniel French, Eunice Chapman et al.; and thereby sought a discovery on oath against Chapman and French, of the assets of the firm of McNulty & Co. Chapman and French filed separate answers on oath, professing to answer with very great particularity the allegations of the bill, and again prepared very complete schedules of the assets of the firm of McNulty & Chapman, but in neither of these answers are the Baldwin bond and mortgage referred to directly or indirectly.

On the 28th February, 1842, Albert McNulty filed his petition in bankruptcy for a discharge; and on the 7th December, 1842, Azor S. Marvin did the same thing; but in neither of their schedules is the Baldwin bond or mortgage alluded to.

On the 31st October, 1846, French, as the assignee of Chapman, made a sale of the remaining assets held by him, to Eunice Chapman, the complainant herein, and in the bill of sale to her, the Baldwin mortgage appears for the first time to be enumerated as parcel of the assets of McNulty & Chapman. One aspect of the bill filed in this case is, to foreclose this mortgage as belonging to Eunice Chapman; and her right to the mortgage is supported by the testimony of her son, G. M. Chapman, and of Daniel A. Baldwin.

As to the fee of the land after the assignment of the mortgage to Thayer, and conveyances to him on the 5th March, 1842, it appears that on the 26th December, 1844, he con-

veyed the whole property to Charlotte Smith of Boston, with special warranty, Baldwin having failed to re-purchase the same within the time stipulated.

On the 9th April, 1850, Charlotte Smith conveyed the premises to William B. Ogden for the consideration of $6,000. And afterwards, in March, 1855, William B. Ogden conveyed the premises to Mahlon D. Ogden and Edwin H. Sheldon, the defendants.

The complainant claims in her bill that the deed made by Baldwin to Thayer, though absolute on its face, was in fact but a mortgage, and that King's agreement to procure from Thayer a contract to sell the land back to Baldwin, operated as a defeasance, or was evidence tending to show the deed to be a mortgage. It appears that the King agreement was never recorded; but the testimony of Baldwin and Chapman was introduced to show, amongst other things, actual notice in the defendants of this agreement, and of Baldwin's claim that the Thayer deed was a mortgage. And Baldwin, on the 2nd of January, 1855, claiming that his deed to Thayer was only a mortgage, conveyed the premises by quit-claim to the complainant, and afterwards became an important witness in behalf of the complainant, to make out her case.

Evidence was introduced on the part of the defendants, tending to show that both the witnesses, Chapman and Baldwin, were interested in this suit in procuring a decree in behalf of the complainant, a lady upwards of eighty years of age.

WILLIAMS, WOODBRIDGE & GRANT, for Appellant.

C. BECKWITH, and F. H. KALES, for Appellees.

CATON, C. J.  In no case which has ever before been presented to this court, have we had so much difficulty in comprehending and fully understanding the facts. The whole controversy is about the facts, and yet all these facts result in two great questions, upon which the whole case depends; the first of which is, whether a certain mortgage really belongs to the complainant; and the second is, whether a transaction

between Daniel A. Baldwin and Ebenezer Thayer was a mortgage, or a sale with a right to re-purchase.

The various transactions of the parties connected with this affair are so numerous and so complex, that to make them fully understood, would involve the necessity of reciting nearly the whole of the evidence which constitutes the bulk of this immense record. This would unnecessarily encumber an opinion, without any corresponding advantage to the profession and the public; and the interest of the parties is centered in the decision itself, independently of the reasons for that decision.

A very succinct history of the leading incidents of this case may without impropriety be here given, and to do more than that we are not inclined, for in order to understand the case, we have been obliged to study it so much that its contemplation even has become distasteful and a burden to the court, and no doubt the same is true of counsel.

On the twenty-seventh of January, 1837, Daniel A. Baldwin was the owner in fee of the premises in controversy, and on the same day, mortgaged the same to Moses P. Hatch, to secure the sum of twenty-two thousand five hundred dollars. The ownership of this mortgage is one of the controversies between the parties. The complainant claims to have derived title to it in two ways. First: that Marvin McNulty and George M. Chapman, her son, composing the firm of Mc-Nulty & Chapman, bought the mortgage of Hatch, and paid him therefor twenty-two hundred and forty acres of wild lands in Illinois. That ten hundred and forty acres of the land were paid for in money by McNulty & Chapman, and that twelve hundred acres of the same were paid for with the proceeds of a note made by Albert McNulty for the accommodation of McNulty & Chapman, and by them indorsed, and also indorsed by Trask & Marvin, and discounted by the State Bank of Indiana.

The mortgage was transferred by Hatch to Albert McNulty by an assignment absolute on its face, but which the complainant claims was nevertheless in trust to secure the payment of this note, and after that in trust for McNulty & Chapman.

Afterwards, Marvin McNulty, one of the firm, assigned all his interest in the assets of the firm of McNulty & Chapman to his copartner, George Chapman, and he assigned the entire assets of the firm to Daniel French, who, as such assignee, sold the mortgage in question to the complainant, as she alleges. This shows in brief one of her claims of title to the mortgage in question.

Second : That Albert McNulty assigned the mortgage to Azor S. Marvin, to secure the payment of the note above mentioned, and an obligation of McNulty & Chapman to Nevans & Townsend, which Azor S. Marvin and his copartner, Alanson Trask, were liable upon as indorsers for McNulty & Chapman, and after paying these in trust for Albert McNulty.

A judgment was obtained by the State Bank of Indiana upon the note above mentioned against George M. Chapman, Marvin McNulty, Azor S. Marvin, Alanson Trask and Albert McNulty, upon which an execution was issued and levied upon the goods of George M. Chapman. Chapman then procured H. H. Hunnewell to buy the bank judgment, and after selling the goods of Chapman which had been levied upon, the execution was returned *nulla bona* as to the residue ; a formal assignment of the judgment was made by the bank to Hunnewell, and Chapman then procured him to file a creditor's bill in his name against all of the defendants in that judgment, to have the mortgage subjected to its payment.

On the fifth of March, 1842, Azor S. Marvin transferred the mortgage to E. Thayer, in pursuance of a settlement of that suit made with him as the agent of Hunnewell.

The complainant claims that Hunnewell stood in a fiduciary relation to Chapman, and his assignee, French, so that when Thayer received an assignment of the mortgage from A. S. Marvin, he received it in trust for French, as the assignee of Chapman, from whom the complainant claims title to the mortgage.

Previous to the fifth of March, 1842, the premises had been sold for taxes, and under this tax sale John P. Marvin had acquired a tax title.

Now the titles to the property may be summed up as

follows : The $22,500 mortgage standing in the name of Azor S. Marvin, to secure the payment of the Indiana bank judgment, and the debt of Nevans & Townsend against McNulty and Chapman. A tax title held by John P. Marvin. The equity of redemption standing in the name of Daniel A. Baldwin., The bond to secure which the $22,500 mortgage was given had been sued to judgment, and the judgment satisfied of record. The Indiana bank judgment was, held by H. H. Hunnewell, and by virtue of that judgment he was endeavoring to subject the $22,500 mortgage to its payment. Could Hunnewell succeed in thus getting control of the mortgage, he could foreclose Baldwin's equity of redemption, and perfect the title to the property in himself.

In this position of affairs, Ebenezer Thayer, acting as the agent of Hunnewell, on the fifth of March, 1842, made a settlement whereby he canceled the Indiana bank judgment, and satisfied the debt due Nevans & Townsend, and received an assignment of the $22,500 mortgage from Azor S. Marvin to himself. He then bought the tax title of John P. Marvin, and paid him therefor, and received from him a conveyance of the premises. Baldwin also conveyed the equity of redemption to Thayer. This perfected in Thayer an apparent title.

C. C. King, the attorney of Thayer, gave to Baldwin a memorandum in writing that he would procure from Thayer an agreement to sell to Baldwin the premises upon the payment of eleven hundred and fifty dollars, with interest and taxes, within eighteen months, but no such agreement was executed.

The complainant, however, claims that this memorandum by the attorney of Thayer was binding upon him, and made the transaction as between Thayer and Baldwin a mortgage, or that it was in the nature of a mortgage upon a mortgage, and as Baldwin has quit-claimed to the complainant, she has succeeded to his right, and upon performing the condition, shows a title independently of the one she acquired from Daniel French, the assignee of her son, George M. Chapman. But we cannot regard this transaction as a mortgage ; at most

Chapman *v.* Ogden et al.

it is but an agreement to sell for a certain sum, and is subject to the incidents of such an agreement.

The defendants derive their title directly from Thayer, thus: Thayer conveyed the premises to Charlotte Smith, and she conveyed the same to the defendant, W. B. Ogden, and he conveyed the same in certain proportions to the other defendants.

We do not deem it necessary to go into the investigation of the question of notice to the defendants of the rights claimed under G. M. Chapman, because we are satisfied, after a careful examination of the evidence, and all the circumstances detailed by the various witnesses, that McNulty & Chapman never did in fact purchase the $22,500 mortgage, and that the note discounted by the Indiana State Bank was made for the accommodation of Baldwin, and that it was his debt to pay, and that the mortgage in question and also another mortgage were in fact satisfied by the twenty-two hundred and forty acres of land.

If the testimony of Chapman and Baldwin in this case was to be taken as absolutely true, we should undoubtedly arrive at a different conclusion, but we agree with the court below, that all the circumstances which are detailed in the record, and which in themselves are undisputed, show that their statements must be discredited; we must take their former statements sometimes sworn to and sometimes not, but which are corroborated by an infinite variety of other circumstances, rather than their present testimony, which is, we think, effectually impeached by other evidence. This could be clearly shown by a careful analysis of the record, but an opinion which would do this would make a book of itself, and yet it would settle no principle of law which could be of service in the determination of other cases. This we do not think it our duty to do, but it would rather be going beyond the bounds of propriety, as it would appear for a mere display.

We are satisfied the complainant has shown no title, and the decree must be affirmed.

*Decree affirmed.*